Runs to death 4506 to happen on behalf of the force presented you can proceed. May it please the court and counsel, again my name is Vicky Coros, I'm from the office of the State Appellate Defender on behalf of Armando Gallardo who is appealing his conviction and 30 year sentence for attempt first degree murder. The issue here is intent and attempt murder requires a specific intent to kill. The act of firing a gun even in the direction of another person with nothing more is not an attempt murder, it's an aggravated discharge of a firearm. In this case the evidence even viewed in the light most favorable to the prosecution did not prove beyond a reasonable doubt that Armando Gallardo had the specific intent to kill Gabriel Barrios. Direct evidence of specific intent is hard to come by so it can be inferred to be direct evidence. No, that's correct. So we look at the surrounding circumstances and there are three particular factors that we look to. There's the character of the attack, the use of a deadly weapon, and the nature and extent of the victim's injuries. In this case the two last factors basically cancel each other out. We have a firearm but Barrios wasn't injured. So the character of the attack takes special importance here. But again, even looking at it, there's not enough evidence there to establish a reasonable inference of an intent to kill. First as already noted, Barrios wasn't shot. He testified that he was standing in front of his girlfriend's house when he heard some shots fired. He didn't see them, he didn't know where they came from, and he didn't think they were in his own direction. There was no testimony that he had to duck out of the way or seek cover or anything. Next is that there was evidence that there were three shots fired but none of them, there was no evidence that any of them landed near or even around Barrios. In fact, like for instance, there was no damage to the siding of the house or the porch where he was standing, no such evidence. There was evidence that there were three shell casings found in the street and most importantly, one fired bullet. And again, this bullet was found in the street. Barrios wasn't in the street, he was standing on his porch at the time. Also as far as the character of the attack, we look to Adam Argo's testimony. He basically gave the details for what happened and again, we have to remember who this Adam Argo is. He was the co-offender but he wasn't charged in this crime. He was charged with attempt murder in another case and received significant charge reduction which he pled guilty to and a significant sentence reduction which had already been served by the time of trial. Yes. The trial court judge found Argo credible. He did say something to the effect that an argument can be made that the substitution of the defendant's name for Argo's name is a great deal of the evidence presented would still be a consistent theory in the case. True. And exactly. And I'm not asking the court here to second guess what the trial court decided with respect to Argo's testimony because even taking Argo's testimony as true at face value, that also didn't establish, that wasn't enough to establish a specific intent to kill or an inference for such. And I'd like to highlight a couple things that were especially significant about Argo's testimony. One is that he didn't see the actual shooting. He said he saw Gallardo's arm and hand out of the car window. And he heard the shots. Well, then he heard the shots. He didn't see what was in Gallardo's hand at the time. And it wasn't until he heard the shots, he didn't see them, that he realized that there was a shooting. Again, so what we have from Argo's testimony is at the time the shots were fired, Argo didn't see what or whom Gallardo was aiming at. But, I mean, isn't it, don't you have to look at Argo's testimony in the trier fact make reasonable inferences. He said, go circle around, he got in the back seat, he put on gloves, he threw a gang sign, he extended his arm, there were three to four shots heard. He climbed back in the front seat and he said, I think I got him or I think I hit him because I was aiming or something to that effect. So that goes to the credibility of Argo's testimony, correct? Yes. And didn't the fact finder, the judge in this case, make a determination that Argo's credible? Yes. So what does it take for us to reverse that trial court's determination? It's true that the trial court found Argo credible, but the inferences that the trial court drew from Argo's testimony to reach the inference of an attempt to kill were totally unreasonable considering the so many unknown variables that were still, that there are so many other more reasonable inferences that should have been drawn and the inferences that the trial court did draw were, in fact, unreasonable. For instance, the idea that, again, looking at Argo's testimony, it's plain that there was no plan here. Argo said they went to this area that's known for the rival turf, but again, he says, I don't know why. I don't know what we were doing there. He says they saw Berrios shaking up with another man. Well, do you know Berrios? No, I had no idea who Berrios was. And was Argo a gang member at that point? Argo, he's, according to his testimony, he was not quite an official member, but was trying to join the gang. And again, they're just, first, I guess the point is that Argo's testimony doesn't establish that he knew what was going to be happening or that they went there with the purpose of killing a rival gang member. They were there and circumstances presented themselves and Gallardo directed him to circle the block. If they wanted to kill him, why didn't they shoot him right then and there when they first encountered Berrios shaking up with the other man? Instead, they went around the block, they stopped in front of the house that Berrios was standing. You know, Argo didn't pull over, he didn't, like, go into the driveway to make it a better shot or anything. He just stopped right in the middle of the street and that's when Gallardo put his hand out. Doesn't the Green case tell us that poor marksmanship is not a defense to attempt first degree murder? It does, but this isn't really a case of poor marksmanship because we don't know what the mark was. In Green, there was direct evidence that the defendant was pointing at the victim. In fact, that's, I guess I can get to that right now, is that the state's cases that are cited both in its brief and the ones that they relied on in the trial court and that the judge ruled below, all of these cases, there are two things that make them very different from this case and why they have no, they shouldn't be relied on here is that one, in all of those cases, there was testimony either from the victim or another eyewitness that the defendant was pointing the gun right at the victim when the shots were fired. Here we don't have that evidence. Argo didn't see the shooting, Barrios didn't testify that he was being shot at, and none of the other neighbors that were outside saw the shots. Does Barrios need to testify that his life, that he was being shot at? Is the victim's awareness of the attempt on his or her life necessary, is it required? It's not. As long as there's another witness there to say that the gun was being pointed at this person. And even if you don't have that, then at least with these other cases, which again, are so unlike this case for the second reason is that in those cases, there's some physical evidence showing that the shots fired struck something in the area of the victim or something next to the victim or someone next to the victim. In all the cases, there was like bullet damage to the car that the victim was sitting in or to some piece of machinery that was right next to the victim or another bystander standing next to the victim. You don't think his statement that, I think I got him, is enough? I believe that statement is just too ambiguous to make an inference of an intent to kill, especially where the courts have said that an intent to do great bodily harm is not a substitute for an intent to kill. What does got mean? What does he mean? I got him. I shot his ankle. I shot his hand. We just don't know. There's no intent to kill there. He even says, well, I think I got him or I think I hit him because I was aiming. Aiming at what? I was aiming at his foot. I was aiming at his hand. Again, just too ambiguous to draw the kind of inference necessary to find beyond a reasonable doubt that there was a specific intent to kill here. Another thing I wanted to briefly touch on is that I'm assuming that the state's going to come up and make a statement about this being a gang-motivated shooting. But a gang, again, the fact that it was gang-related doesn't really have anything to do with what the intent was. It doesn't tell us what the specific intent here was. Again, there could be a lot of reasons behind why one gang would want to shoot at another gang. Maybe they want to send a message. They want to intimidate. They want to, even if they want to hurt somebody, to do great bodily harm, that is not enough. Because you need a specific intent to kill and that wasn't here. I want to ask you about, you wanted to suggest that there was no plan here. Yes. But the trial court looked at all of the things that happened from when they first saw Mr. Berrios until the shots were fired as a plan. There he is. They're exchanging gang signs. I flash a sign. Tell the driver. Driver on the block. I can't remember the term they used, catch him or something like that. Putting on gloves, moving to a better spot. You said, well, they didn't pull him in the driveway. Well, that makes it much more difficult as a getaway when you have to back out of a driveway. He stopped in the middle of the street, exactly in front of where the, from the state's perspective, they would be victims standing. I mean, why isn't that a perfectly orchestrated plan, at least done on the fly? Well, I guess there's a difference between something that's planned and something that's improvised. So perhaps once they got to the area and they saw someone, you know, gesturing in a way that suggested they were from a rival gang, that that sent something in motion, at least on Gallardo's behalf, but not Argo. He still didn't know. Even when they circled the block, he didn't know why they were doing that. When Gallardo got into the back seat, he wasn't sure what he was doing back there. And also the state's, I'm sorry if I, the trial court's, you know, reasoning that Gallardo put himself in a better position to aim from the back, that doesn't even make any sense. He was a passenger in the seat and he got into the passenger back seat. I don't understand why being in the front or the back would make it any better of a, you know, Don't have to shoot over the driver? Well, he was on the passenger side and the house was on his side. It was closest to him. So I don't know that it makes any difference whether he's in the front seat. Especially if Argo's not, you know, he doesn't have any real role here to begin with. So again, the trial court, I think, was stretching by a couple of the comments and remarks it made trying to find a specific intent to kill here. How much of a plan do you need, though? Is it enough of a plan to say, okay, let's think about this, let's drive around the block and let's do it the right way as opposed to just doing it off the cuff right then? Or do you need a plan that's, okay, we're going to come back in an hour and really, you know, hash through this? I don't know, you know, plan versus improvise is a matter of a few minutes. Yeah, I guess using the word plan sort of derailed the argument here because it really doesn't matter whether or not there was a plan. The fact is, a gun was fired. The question is, what or whom? And that answer is unanswered by this record. And that's really what the whole point is here. Because again, with all the other cases, yeah. No, please. I wanted to, just before you finish up, I wanted you to address his alibi defense and mom's statements concerning the alibi defense. Again, at this point, I recognize I'm bound to a death row actual standard of review that this court will take, and so, you know, I don't think I can make an argument that you need to reweigh the evidence or, you know, reject one side of the story and go for the other. I think at this point, we're relying on, you know, the issue of intent and not identity. So that's where we're at at this point. Another thing that I wanted to address, well, I think basically that's about it. Number one, there's no direct evidence, or I'm sorry, even circumstantial evidence to show, you know, who or what Gallardo was pointing at at the time the gun was actually fired. And two, there was no physical evidence. In fact, the physical evidence not only doesn't support an inference, it actually refutes it. The fact that there's a fired bullet found in the street. Again, Gallardo wasn't, I mean, Berrios wasn't standing in the street. He was standing, you know, either on the sidewalk or on the front porch of the house. So again, that suggests that Gallardo was aiming elsewhere and not pointing it directly at Berrios at the time of the shooting. So, again, viewing all the evidence, even in the light most favorable to the state, I think no rational trier of fact could have found the unreasonable doubt that specific intent was proved in this case. And for those reasons, we'd ask that you at least reduce Mr. Gallardo's conviction to an aggravated discharge of a firearm and send it back for resentencing. Thank you. Any questions? No. Thank you. Ms. Kripke? Good morning. May it please the Court. Joan Kripke on behalf of the people of the State of Illinois Council. Well, we disagree with the defendant's argument. First of all, I'm shocked. We disagree for several reasons. First of all, you need a substantial step to show an attempt. And I think that there was more than just a substantial step taken here by the defendant. And one of the first things I do want to say is it doesn't matter what Argo knew, because Argo is not the defendant. He's just the driver, and he's following the directions of the defendant. And that's what's really key here, to show that this was a premeditated event. I looked at my brief, and you would have to look at the record again, but in my brief, on page 450, what I have written here is that the defendant told Argo, let's go to 3rd and Woodlawn Avenue, that area. So he directed him to look for gang guys, to look for Lantan King members. They're maniac Lantans, whatever. They're not Lantan Kings. They're a rival gang. And clearly, Argo, the defendant, was the senior member between the two, and Argo was a wannabe, or trying to get into the gang, or a lower level. So he's following directions. Once they get to the area, they circle the block slowly. We have these witnesses, these three men outside, who saw this happening. And then they leave the area, and Argo, the defendant says to Argo, hit the block, or something like that, meaning circle the block. And while that's going on, he gets in the back seat, he pulls up the hood on his sweatshirt to obscure his face,  When the defendant got back into the front seat, Argo saw the gun at that point. The defendant then told Argo, they flashed gang signs with Berrios, and he said, another man. And he said, oh well, he's sending out fake gang signs. So he told Argo to stop at that house. He then filed, excuse me, three to four times. And this is what, I don't think I have the reference here, but I believe I read it in the record. For sure there were three shell casings found. I think the last one was not a fourth, just a bullet found there. I think it was a bullet inside a shell casing, which means it's something that ejected from the gun and never got fired. I thought that's what the record said. So it's not like he fired at the gun down there and they found a bullet there. I just don't have a citation for that. Let me ask you this, if shooting a firearm in the direction of another human being is sufficient to establish specific intent to kill, how is it any different from an aggravated discharge of a firearm? What's the difference? The difference is the intent. And we know that just shooting a gun, regardless of how ridiculous it is, to add another human being, everybody knows that the result from that can cause great bodily harm or death. But then what we're talking about here is the intent. And the circumstantial evidence leading to all this shows the intent. And first of all, we haven't talked about the second incident that happened six days later. Well, that incident is important because the defendant clearly is claiming ownership or that he had the gun. And the defendant never contests that he was the one who was the shooter. And I agree with you. I think the reason that he went into the backseat, I'm not sure that there was evidence there to show that he was shooting across the street there. They pulled up in front of the house and I think he got in back of the driver because they pulled up on the side of the street where the driver was standing. He wasn't shooting across the street. Regardless, it's not really clear from the record. But whatever it is, it was clear that he was not facing the driver when he was shooting, that he was facing out the window. And if indeed the driver said, I saw his arm and his hand out the window, then he had to have been shooting out the window in back of him. Does the victim need to be aware that he's being shot at? I don't think so. What if you shoot somebody in the back and they don't know it? What if he had been guarded? The victim said he was talking on his phone. He was walking around and talking on the phone. So why is it incumbent upon the victim to know? One of the cases that the court reversed on that was cited to, and I don't remember the name, was one where the defendant aimed at a bar and there was someone standing inside behind the door. And they said, well, that doesn't count because how was he to know that there was someone there? That was Wagner or Trinkle, one of the two. It was Trinkle. I mean, I sort of disagree with that result. I mean, one could infer that there would be people, but that's neither here nor there. I think that in any of the cases that you cited, was the victim unaware of the attempt on their life in an egg? I don't believe so, but I don't think that that was the key element. I think the key element was the acts of the defendant. I mean, it's the intent that the defendant has, and that's what we have to look at. I think it's irrelevant what the other person knew. You know, you cite that Sawino, Johnson? Yes. For the proposition that evidence that a defendant discharged a firearm in the direction of another individual either with malice or total disregard for human life is sufficient for conviction. In this case, reading the trial court judge's ruling, did he ever make a finding of either malice or total disregard for human life? I don't believe he did. On the other hand, do you think he needs to? No. I think that there's law that says that if you fire a weapon, fire a gun at another person, that's with total disregard for human life, if you have any kind of understanding of the capability of a gun, and its purpose, which is meant to kill somebody or something. Going back to the trial court judge's ruling in this case, he accepted Argo's testimony as credible, and he said it was corroborated by other evidence. Right. And it is. And this is one thing that the defendant argued. Did he cite what other evidence it was? No. But I'll be happy to tell you some of the evidence that was corroborated by it. When Argo testified, when he spoke to the police, he said, on the second incident, which I never got to, I interrupted myself, the defendant was driving his family's car in that incident, and they were being chased by the police for reasons unknown to us. And during that chase, the defendant said to Argo, call Nelson Caceres and tell him we're coming by the house and to look because I'm going to toss this gun out the car into his front yard and he should retrieve the gun. When, apparently, Caceres never either got the message, and Argo said, I don't know if the exchange occurred. I don't think he means the phone conversation. He meant the exchange of the gun from the defendant to Caceres. Regardless, when they got to the police, they don't say how they, the police don't say how they knew where to go, but they knew where to go, and they found the gun there. And two different officers testified, the man who found it and then the FBI agent, whoever it was who collected it, said there were these abrasions or scuff marks in the grime on the pavement which indicated they'd been tossed. But regardless, the defendant, when he was talking to the police a year later in August of 2012, he said to them, I'll tell you where the gun was if you cut me a deal here. But the police clearly didn't need that because they already had the gun. And so what Argo was saying to the police then was corroborated. And Argo said, it was the same gun because I saw it when he tossed it on September 12th, and it was the gun that I saw on September 6th. And lo and behold, when they checked the shell casings versus the gun that they'd gotten recovered on the 12th, it was the same gun. Talk about this Argo guy and his credibility. I mean, I think the Newell case tells us how to look at the credibility of a witness who is an accomplice in their testimony. And they say that it's fraught with serious weakness. And this Argo guy, I mean, the sentence that he received in exchange was four years at 50% off on a class two when he was charged with an attempt first degree murder. Right, but- I mean, what was his incentive? But the, and the defendant makes that point in his brief, and what he says is, oh, look at the discrepancy in the sentence. Not true. The 20 year, there was a, the defendant in this case received a 30 year sentence. But it wasn't really a 30 year sentence. He received a 10 year sentence with a 20 year mandatory add-on because he discharged the weapon. And he never contests the fact that he discharged the weapon. And Argo said he discharged the weapon. The defendant doesn't contest it. And the defendant says, hey, I'll tell you where the gun was. And Argo said, I saw him with the gun on two different occasions. So what you have to really compare is, what two sentences did they get? The defendant in this case got a 10 year sentence for an attempt first degree murder. And Argo bargained down to a four year sentence. That's not such a great discrepancy. When you look at it, when you're looking at the actual sentence. So the add-on was the- It was the add-on that caused the discrepancy. So whether he had the intent to kill or not, he still fired the weapon. He fired that weapon, absolutely. And he's not contesting it anywhere. So he can't say that this was something, that it was based on the fact that he had pleaded down. And also, we don't know what the sentence was. And also, it's really not appropriate to compare sentences because we don't know the background of the two people, what's factored in when the judge sentences them. And they were two different cases. And we don't know what happened in that other case. Do you find it remarkable that this victim indicated that he's on the front steps in his house, but you have no rubicles or anything in the front of the house? I mean, you have everything kind of down by the street. Well, but that's where shell casings end up. They eject out of a gun. Pardon me? Were they all empty shell casings? No, but one of them I thought, I thought the fourth one, the defendant's saying it was a bullet found at the feet to sort of indicate that he might have been firing at, down. I believe I read that it was a shell casing with a bullet in it, which meant it was something that, you know, the bullet didn't eject. And maybe that's why the whole gun, maybe something jammed, I don't know.  who knows how these people are firing the guns. It seems to be in vogue to turn your hand sideways and shoot like this instead of the way people are properly taught. And then the bullets go all over the place. And again, bad aim does not mean you don't have the intent. It means you have bad aim. Isn't this also consistent with our defendant here just firing into the air, just firing into the sky? Wouldn't the bullets land in the same place, still hear sound, still not have any bullet holes anywhere near the intended victim? You could, you could. First of all, there's no, there's, I think the role to belie that is the defendant's statement, I was aiming. Which comes only out of the mouth of Argo, who we all have to agree had some incentive to testify. Argo had incentive, but think about what it was. Argo, that sounds very much like a, to me it rings true. It sounds like an excited utterance. But the defendant would have said, after he had fired a gun at somebody, I think I hit him, I was aiming, think I got him. To me, it depends on how you look at it. I think the judge might have looked at it and said, that rings true. He didn't give a discourse, he didn't deny it, he didn't say, oh shoot, I was aiming, you know, whatever. It just, to me it rings true. To someone else it may not ring true. But I think also, you can come up with all kinds of scenarios. Maybe he was shooting up, maybe he was shooting behind. But, you know, Pinto says you can't come up with all these, you know, he could have been shooting at aliens, but we didn't see the aliens and they got hit. I mean, it's the evidence that you have before you that you have to look at and you have to evaluate. And you can't come up with all these different theories of what might have been. I mean, what I'm saying is that, what most of these cases say is, he had bad aim. Or he didn't know how to shoot the gun, or who knows what. But I think all the circumstances taken together, with the testimony of the three men on the street who saw the car come around twice, the fact that the defendant told him, first of all, to go specifically to that area. Again, it's on page 450 of the record. It's irrelevant what Argo knew or why he was doing it. He did it. And it's the question of why did the defendant want to do it. Maybe the defendant didn't tell them, but that's, again, irrelevant. If it was in the defendant's mind that he wanted to confront Latin kings, because he said, let's go look, he did say, they knew that that was a Latin king area. It's confronting the same as specific intent to kill. When you show up with a gun and discharge it at somebody, that shows an intent to kill. At somebody. That's the piece that the defense argues was not proven. That that's a leap. Given the statements of the defendant, that he wanted to find Latin kings, that he thought that this person was, quote, unquote, bullshitting when he threw up fake gang signs, and told him to go back to that guy. And they went back specifically to find him. And he was, I don't know where the other man was, but this guy was there. And again, out of his mouth, well, according to Argo. But again, I think I hit him. I was aiming. And I think all of that taken together, along with all the other things, the fact that the defendant did not deny that he was the possessor of the gun, that he knew where it was, that he was admitting that he had thrown it out the window of the car in the second incident. The fact that Argo never claimed to own the gun, never claimed to have fired it. And the fact that Argo heard the gun discharged. Let's say Argo wasn't, let's say they were just walking down the street and all of this happened, but Argo's blind. But he hears the gun being discharged. Does that sense, just because he didn't see it, do we say, well, that's not good enough because you heard it, even though he was right there next to the man? I mean, at some point you have to say, you know, all your senses, are they all equal or are they not equal? And if you're in front of somebody who shoots a gun, you should pretty much know that the gun is coming from very close by versus someone down the street, especially if you're in a closed space like a car. If you've ever been, you know. I don't think he's denying that he shot the gun. I don't think that he's denying that he shot the gun. I think that the issue is the intent. But thank you so much for your time. Thank you. Can we ask you to affirm the conviction? Ms. Toros. Your Honor, this revolves going to be brief. I just want to clarify, like maybe four or five points, just because there were some question marks after, that the court seemed to raise here. Number one, about the fired bullet, the expert testified that it, and he described it, as a fired bullet. It wasn't a bullet encased in its shell or anything. The expert called it a fired bullet. And while he was able to identify the shell casings as having been fired from the gun, he wasn't able to say with expert certainty whether the fired bullet was fired from the gun. So, you know, this wasn't a jammed gun situation. There was no evidence of that. This was a fired bullet that was found in the street. The second point is that Argo was corroborated, or at least that's what the trial court found. And indeed, he was corroborated on identity. But we're not arguing identity. We're arguing intent. Argo said there was another person in the car with him who fired the gun. Everybody, all witnesses who saw the car, at least one person noted that there was a second person in the car. So we know Argo didn't do this himself. So Argo was corroborated on the issue of identity. Intent, he could not speak to it because he did not know. Third, as far as this being a premeditated act, again, it's sort of besides the point. We don't know what the intended act was. Was it to kill? Was it to scare? Was it to hurt? Was it to send a message? We just don't know. There are too many question marks left based on this record. Fourth, as far as the sentences, I don't recall making any sort of sentence argument in my brief. But as far as Argo getting a lenient sentence on the other case, again, he was charged with attempt murder. And based on the facts that we can glean from the record as far as what happened in that other case, it sounds like there was a weapon used in that case. So he was looking at, you know, not just an attempt to murder, but plus an add-on for a weapon. In this case, so he got, in fact, he ended up getting four years. We do know that. He ended up getting four years on that. And with time served, he was already done with that sentence when he was testifying at Gallardo's trial. And in this case, the sentence between what you'll get for an attempt murder with firing a gun as opposed to what it is for an aggravated discharge, it's very stark in its difference. With an aggregated discharge, you're looking at four to 15 years. So even if Gallardo sentenced to the max at 15, it's still half the sentence right now. So it is a significant, whatever deal Argo got, it was a significant one for his testimony. So unless there are other questions, again, we'd ask that you reverse the conviction and at the very least reduce the charge. Thank you very much. Ladies, thank you very much this morning for your intelligent arguments. It's always a pleasure when we have interesting cases and good, well-prepared attorneys before us. So thank you. We'll take this case under consideration, record a decision in due course. Court will be in recess for a few minutes.